OPINION
{¶ 1} Sean A. Lloyd was convicted after a jury trial in the Montgomery County Court of Common Pleas of receiving stolen property, a fifth degree felony. The court sentenced him to five years of community control. Lloyd appeals from his conviction, asserting that his counsel *Page 2 
rendered ineffective assistance, that his conviction was based on insufficient evidence and against the manifest weight of the evidence, and that the trial court improperly ordered restitution. For the following reasons, Lloyd's conviction will be affirmed, as modified, and the matter will be remanded to the trial court for resentencing.
 {¶ 2} The state's evidence at trial established the following facts.
 {¶ 3} Sean Lloyd worked in the Management Information Systems ("MIS") Department of National City Mortgage ("National City") at its Miamisburg, Ohio offices. His job involved asset management, which included accepting new computer equipment from vendors, unloading trucks, and keeping track of computer assets. When computer equipment was returned to the MIS Department, the equipment was sent to a company called Benchmark, which kept the equipment for storage, redeployment to other employees, or disposal. National City did not allow employees to take home computer equipment. However, it was not unusual for technical employees to carry equipment to their cars and take the equipment to another building on the National City campus.
 {¶ 4} In late December 2005, National City began an internal investigation of employees stealing computer items and then reselling them on eBay. The investigation initially led to Shawn Lambert, Michael Sharpe, and Christopher Beatty as suspects in the thefts. Lambert began working in the MIS Department at National City in August 2005 through Robert Half Technologies, a temporary employment agency. Lambert was responsible for transferring users' data from older laptops and desktop computers and setting them up on new work stations. Lambert dealt with Lloyd on a day-to-day basis, picking up new equipment and returning old equipment. *Page 3 
 {¶ 5} Lambert admitted that he took equipment from National City without permission, mostly for his personal use at home. Lambert also acknowledged that he took desktop memory chips from computers that were being shipped to Benchmark and sold them on eBay without permission from National City. Lambert identified Lloyd as an individual who was supplying him with computer parts, and he stated that he went to Lloyd's home around Christmas 2005 and got computer equipment, including a Cisco router and PC-133 memory chips, from Lloyd.
 {¶ 6} On February 1, 2006, Jim Swauger, who performs corporate security services for National City, contacted Detective Patrick McCoy of the Miami Township Police Department to report the internal thefts. McCoy interviewed Lambert, Sharpe, and Beatty as suspects in the thefts. McCoy learned that Lloyd was supplying computer parts to Lambert. Sharpe and Beatty, however, denied knowing Lloyd or receiving anything from him.
 {¶ 7} On February 15, 2006, at approximately 5:30 p.m., Swauger and his supervisor, Gary Smith, were leaving to discuss the case with McCoy when they saw Lloyd carrying three 17-inch LCD monitor boxes. Smith, Swauger, Lloyd, and Wesley Nease, another employee, waited for an elevator together. Smith said to Lloyd that it was a nice day, and he asked Lloyd if he was planning to return. Lloyd stated that he was not coming back. Swauger and Smith entered Smith's car and drove by Lloyd's SUV. Swauger wrote down Lloyd's license plate number as Lloyd put the monitors in his back seat.
 {¶ 8} On February 16, 2006, McCoy, along with Detective Scott Moore, interviewed Lloyd at National City. Lloyd told the detectives that he knew Lambert, but *Page 4 
he denied giving any computer components or items to him. McCoy asked Lloyd if he had removed three 17-inch monitors from National City the previous day. McCoy told him that Swauger and Smith had seen him on the elevator. Lloyd admitted that he had taken the three monitors and that they were at his house. Lloyd later gave the officers permission to search his house and retrieve the monitors. Lloyd stated that Charlene Dixon, his supervisor, had given him permission to remove the monitors from National City, and he indicated that the monitors were going to be thrown away.
 {¶ 9} McCoy went to Lloyd's residence with Smith, Moore, and other officers. Although they saw USB cables on the desks, they found no computer units in the house. In the basement, McCoy located empty Hewlett Packard computer boxes with address labels addressed to National City Mortgage. McCoy also located a receipt from the U-Store-It storage facility on North Smithville Road that was in Lloyd's name.
 {¶ 10} The next day, McCoy went to Lloyd's home and informed him that he had not located the computer monitors. Lloyd offered that his friends must have thrown them away. McCoy subsequently obtained a search warrant for the storage facility. On February 24, 2006, McCoy executed the search warrant with Detective Sakal, Slater and Smith. McCoy created an inventory and receipt for approximately eighteen groups of items removed from Lloyd's storage unit. McCoy contacted Swauger, informed him that the police had recovered computer equipment from a storage facility, and stated that he wanted to know if any of the assets were National City's based on their serial numbers. The LCD monitors were not found at the storage facility.
 {¶ 11} National City "didn't have a clear system in place" for maintaining an inventory of computer equipment, which included thousands of computers, and the *Page 5 
records were not maintained together. As stated by Swauger, "records were everywhere." However, over the next couple of weeks, Swauger looked through several of National City's records, including invoices for larger "capital items," and he was able to identify two of the printers found in the storage facility (items four and six on the inventory) as belonging to National City. Swauger stated that the keyboards, two additional printers, and the computer mice were the same type as used by National City, but he could not trace them back to National City. Swauger also could not trace the memory chips.
 {¶ 12} On May 5, 2006, Lloyd was indicted for receiving stolen property belonging to National City with a value of $500 or more. After a jury trial, he was convicted of the charge. At the sentencing hearing on January 10, 2007, the court sentenced Lloyd to five years of community control and ordered him to pay restitution to National City in the amount of $4,315.84, plus court costs, a supervision fee of $50, and attorney fees of $130.
 {¶ 13} Lloyd appeals, raising six assignments of error, which we will address in a manner that facilitates our analysis.
 {¶ 14} "II. "APPELLANT'S CONVICTION WAS AGAINST THE SUFFICIENCY AND/OR THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 15} In his second assignment of error, Lloyd claims that his conviction was based on insufficient evidence and was against the manifest weight of the evidence.
 {¶ 16} When reviewing the sufficiency of evidence, the relevant inquiry is whether any rational finder of fact, viewing the evidence in a light most favorable to the state, could have found the essential elements of the crime proven beyond a *Page 6 
reasonable doubt. State v. Dennis, 79 Ohio St.3d 421, 430,1997-Ohio-372, 683 N.E.2d 1096, citing Jackson v. Virginia (1979),443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d. 560. A guilty verdict will not be disturbed on appeal unless "reasonable minds could not reach the conclusion reached by the trier-of-fact." Id.
 {¶ 17} In contrast, when a conviction is challenged on appeal as being against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Thompkins, 78 Ohio St.3d 380, 387,1997-Ohio-52, 678 N.E.2d 541, citing State v. Martin (1983),20 Ohio App.3d 172, 175, 485 N.E.2d 717. Because the trier of fact sees and hears the witnesses and is particularly competent to decide "whether, and to what extent, to credit the testimony of particular witnesses," we must afford substantial deference to its determinations of credibility.State v. Lawson (Aug. 22, 1997), Montgomery App. No. 16288. "Contrastingly, the decision as to which of several competing inferences, suggested by the evidence in the record, should be preferred, is a matter in which an appellate judge is at least equally qualified, by reason and experience, to venture an opinion." Id. A judgment should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. Martin,20 Ohio App.3d at 175.
 {¶ 18} Lloyd was convicted of receiving stolen property in violation of R.C. 2913.51(A), which states: "No person shall receive, retain, or dispose of property of another knowing or having reasonable cause to believe that the property has been *Page 7 
obtained through commission of a theft offense." A violation of R.C.2913.51(A) is a first degree misdemeanor. R.C. 2913.51(C). If the value of the property is $500 or more but less than $5,000, receiving stolen property is a fifth degree felony. Id. Lloyd claims that the state failed to provide sufficient evidence that National City owned the computer equipment in Lloyd's possession, that the computer equipment had been stolen, or that Lloyd had reason to know that it had been obtained through a theft offense.
 {¶ 19} In support of his argument, Lloyd cites to testimony by Dixon and Swauger, which described the unorganized system for inventorying and tracking National City's computer equipment. Dixon testified that National City had thousands of computers. She acknowledged that National City "didn't have a system in place" for maintaining an inventory of computer equipment or for keeping track of new purchases. She indicated that there were several people who had authority to create purchase orders for computer equipment. Swauger testified that he did not know "the exact details" of the procedures for deploying equipment, although he stated there were sign out sheets for tracking different types of equipment. He stated that laptops were tracked more heavily than other equipment. Swauger further indicated that the records for computer equipment were "spread out" and that capital equipment, such as printers, were tracked more carefully. Some of the records were in outside storage whereas others were in Swauger's building.
 {¶ 20} Dixon and Swauger both testified that computer equipment was sent to Benchmark for storage, repair, or disposal on a daily or weekly basis. Some items were redeployed to other National City employees, often at branch offices. On some *Page 8 
occasions, Benchmark would repair an item and return it to National City. Non-functioning computer equipment would be salvaged and the proceeds would be sent to National City, or Benchmark would dispose of the inventory in an environmentally sound manner. Benchmark prepared disposal inventories for National City.
 {¶ 21} Despite the apparent disarray of National City's records, we disagree with Lloyd's contention that the state failed to provide sufficient evidence that certain property in Lloyd's possession belonged to the company, that the property was stolen, and that Lloyd knew that the items were stolen. Swauger testified that he was able to locate invoices for two of the printers found in Lloyd's storage unit — a laserjet 1200 printer and an HP Deskjet 2230 printer. These printers were identified as belonging to National City by matching the serial numbers on the printers to the invoices. Moreover, Swauger indicated that the laserjet 1200 was "practically brand new in the fact that it had only printed 3,000 pages in its entire life. And these things are rated for a duty cycle of like 120,000 pages."
 {¶ 22} As for the three 17-inch LCD monitors, those monitors were never recovered by the police. However, Swauger testified that he observed Lloyd taking them to his car on February 15, 2006, and Lloyd admitted to Detective McCoy that he had them. Although Lloyd told McCoy that he had been given permission to take them, Dixon and Swauger both testified that National City had a policy against employees taking computer equipment home. She expressly stated that Lloyd had never asked for permission to take home LCD monitors, that she had never permitted him to take the monitors or any other equipment, and that the 17-inch LCD monitors were new items at National City, which were being deployed to employees, not *Page 9 
disposed of.
 {¶ 23} Swauger acknowledged that he was not able to specifically match any of the additional items found in Lloyd's storage unit as belonging to National City. He stated, however, that the company places National City asset stickers on some of the computer items and that the missing stickers were in "exactly the same place I see most of them put [on] and it's the same type of sticker that we use for an asset tag." Swauger indicated that keyboards and computer mice were the same type as used by National City. Swauger was unable to identify the memory chips as belonging to National City.
 {¶ 24} Although Lambert also admitted that he had no way of knowing where the memory chips came from, he stated that the Cisco router obtained from Lloyd around Christmas 2005 had sticker residue, which matched the location of stickers on National City's routers. In February 2006, both Lloyd's home and his storage unit contained computer boxes with shipping labels addressed to National City.
 {¶ 25} Upon review of the evidence, we find that the state presented sufficient evidence to support the conviction for receiving stolen property. With respect to the monitors, Lloyd admitted that he had taken the monitors, and Dixon and Swauger presented evidence that they were taken without permission from National City. The state's evidence established that two printers belonged to National City. Although Lloyd states that there is no evidence that they were stolen, the fact that they were operable and young in terms of their useful lives created an inference that National City would not have disposed of them. As for several of the items with sticker residue, Swauger's testimony that the stickers were the same size and location as those used *Page 10 
by National City creates an inference that items belonged to National City. Considering the testimony that employees were not permitted to take computer equipment home, we find sufficient evidence to support an inference that the above items were stolen. Moreover, reviewing the evidence as a whole, including evidence that Lloyd himself had taken National City's computer equipment without permission, we find sufficient evidence to infer that Lloyd knew that the computer equipment was stolen. Although the state could not substantiate that the memory chips, keyboard, computer mice, and a few other smaller items belonged to National City, the state's evidence with respect to the other items supported Lloyd's conviction. The jury did not lose its way in crediting the state's witnesses' testimony and finding that Lloyd had received stolen property.
 {¶ 26} Next, Lloyd claims that the state failed to provide sufficient evidence of the replacement value of the alleged stolen property. He argues that the value of computer equipment changes rapidly due to the "tremendous variety among models and in levels of function, expanding technology, rapid depreciation, and the need for compatibility of assorted components with one another." Lloyd argues that the state's evidence of replacement cost, which was provided by Swauger, was insufficient to allow the jury to ascertain an accurate replacement cost for the items.
 {¶ 27} Under R.C. 2913.61(B), if more than one item of property is involved in a theft offense, the value of the property is the aggregate value of all property involved in the offense. The value of the business equipment which retains substantial utility for its purpose regardless of its age or condition is the cost of replacing the property with new property of like kind and quality. R.C. 2913.61(D)(2). *Page 11 
 {¶ 28} During his testimony, Swauger indicated that National City had paid $371.26 each for HP laserjet 1200s in 2003, and had purchased the HP Deskjet found in Lloyd's storage unit for $173.77. Swauger further testified that cost for 17-inch LCD monitors in February was $239.76 each; the total for three monitors would be $719.26. Swauger estimated the cost to purchase the three monitors plus the two identified printers at a little over $1,000.
 {¶ 29} As for items that could not be specifically traced back to National City, Swauger stated that the replacement cost for the keyboards was $24.33; the total value of keyboards recovered from the storage unit was $802.89. Most of computer mice were Logitech, which is one of National City's standard brands. The replacement cost in October 2005 was $15.94 each, for a total replacement cost of $350.66. Swauger estimated the total replacement cost of everything recovered to be $4,315.84.
 {¶ 30} The state's evidence established that the three LCD monitors were new technology, which National City was beginning to provide for its employees. Dixon, Swauger and Lambert all indicated that older CRT monitors were being replaced with LCD monitors. Swauger stated that, at the time he saw Lloyd put the monitors in his vehicle, there were employees who had not yet received LCD monitors. Swauger's testimony that the replacement cost for three 17-inch LCD monitors was $719.26 was sufficient to support Lloyd's conviction for receiving stolen property in an amount of $500 or more. Although Swauger presented the 2003 purchase price for the printers, the jury could have reasonably concluded that the cumulative value of the printers and the monitors exceeded $500. *Page 12 
 {¶ 31} The second assignment of error is overruled.
 {¶ 32} "I. "APPELLANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL, AS GUARANTEED TO HIM BY THE SIXTH ANDFOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AS WELL AS COMPARABLE PORTIONS OF THE OHIO CONSTITUTION."
 {¶ 33} "III. "EVIDENTIARY ERROR VIOLATED APPELLANT'S RIGHTS UNDER THE DUE PROCESS CLAUSE OF THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE I, SECTION TEN OF THE OHIO CONSTITUTION, AS WELL AS APPELLANT'S RIGHT TO COUNSEL UNDER THESIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION."
 {¶ 34} "IV. "APPELLANT RECEIVED CONSTITUTIONALLY INEFFECTIVE ASSISTANCE, AND THE TRIAL COURT VIOLATED APPELLANT'S CONSTITUTIONAL RIGHT TO DUE PROCESS IN ORDERING RESTITUTION IN AN AMOUNT NOT SUPPORTED BY COMPETENT, CREDIBLE EVIDENCE."
 {¶ 35} "V. "APPELLANT WAS DENIED HIS RIGHT TO DUE PROCESS AND A FAIR TRIAL THROUGH INEFFECTIVE ASSISTANCE."
 {¶ 36} In Lloyd's first, third, fourth, and fifth assignments of error, Lloyd asserts that trial counsel rendered ineffective assistance in several respects: (1) failing to file a motion to suppress evidence; (2) failing to use peremptory challenges on two of the seated jurors; (3) failing to research the law regarding valuation of stolen property; (4) failing to object to inadmissible evidence; and (5) failing to request a hearing on *Page 13 
restitution.
 {¶ 37} "In order to prevail on a claim of ineffective assistance of counsel, the defendant must show both deficient performance and resulting prejudice. Strickland v. Washington (1984), 466 U.S. 668,104 S.Ct. 2052. To show deficiency, the defendant must show that counsel's representation fell below an objective standard of reasonableness. Id. Trial counsel is entitled to a strong presumption that his conduct falls within the wide range of effective assistance. Id. The adequacy of counsel's performance must be viewed in light of all of the circumstances surrounding the trial court proceedings. Id. Hindsight may not be allowed to distort the assessment of what was reasonable in light of counsel's perspective at the time. State v. Cook (1992),65 Ohio St.3d 516, 524, 605 N.E.2d 70.
 {¶ 38} "Even assuming that counsel's performance was ineffective, the defendant must still show that the ineffectiveness adversely impacted the judgment. State v. Bradley (1989), 42 Ohio St.3d 136, 142,538 N.E.2d 373. Reversal is warranted only where the defendant demonstrates that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. Id." State v.Dixon, Montgomery App. No. 21823, 2008-Ohio-755, ¶ 22-23.
 {¶ 39} "A. Motion to Suppress
 {¶ 40} First, Lloyd argues that his counsel rendered ineffective assistance by failing to file a motion to suppress, because the officers exceeded the scope of the search warrant when they seized computer equipment from the storage facility.
 {¶ 41} Lloyd argues that the search warrant authorized the seizure of certain enumerated items as well as any additional items bearing National City identification *Page 14 
stickers. McCoy testified at trial that he did not find any of the enumerated items in the storage unit nor any items with a National City identification sticker. Lloyd thus argues that his counsel should have moved to suppress the items seized from the storage facility and that counsel's failure to file a motion to suppress "caused a huge volume of computer equipment to be admitted as evidence at trial without proper substantiation that it had ever been stolen or that it related to alleged offense in any way * * *." In response, the state asserts that Lloyd's argument is not cognizable on direct appeal, because neither the search warrant nor the affidavit supporting the warrant is part of the record.
 {¶ 42} We agree with the state. Although McCoy's testimony discussed the terms of the search warrant and suggested that officers exceeded the scope of the warrant when they seized computer equipment from the storage unit, we cannot determine whether the items seized fell within the scope of the warrant without reference to the warrant itself and the affidavit in support of the warrant. Moreover, we cannot tell from the record whether the computer equipment may have been properly seized from the storage unit under the plain view doctrine.
 {¶ 43} Nevertheless, Lloyd's conviction was supported by Lloyd's admitted taking of three LCD monitors, which were not seized from the storage unit. Accordingly, Lloyd has not established that he was prejudiced by the failure to file a motion to suppress.
 {¶ 44} "B. Jury Selection
 {¶ 45} Lloyd also contends that his counsel should have exercised peremptory challenges for two jurors — Mr. Grant and Ms. Mobley. With respect to Grant, Lloyd *Page 15 
cites the following exchange:
 {¶ 46} THE COURT: "Okay. And if the evidence didn't convince you beyond a reasonable doubt as to each and every element of the crime charged, could you define [sic] the Defendant guilty?"
 {¶ 47} GRANT: "Yes, sir."
 {¶ 48} Although this exchange initially appears problematic, a reading of voir dire as a whole dispels the suggestion that Grant was biased. When the court spoke with Grant, the court had been talking individually with prospective jurors who indicated that they knew prosecutors or law enforcement officers. Just prior to speaking with Grant, the court asked Prospective Juror Harrison (1) if the juror could find the defendant not guilty if the evidence did not convince the juror beyond a reasonable doubt as to each element of the offense, and (2) if the juror could find the defendant guilty if the evidence convinced the juror beyond a reasonable doubt as to each and element of the offense. The court had also asked Prospective Juror Hopper the same questions. The court apparently was seeking affirmative responses to both questions to ensure that the juror would employ the reasonable doubt requirement properly. In our view, it appears that Grant was answering the intended question of whether the juror could find the defendant not guilty if the evidence did not convince the juror beyond a reasonable doubt as to each element of the offense. Grant was subsequently instructed on reasonable doubt during jury instructions, and there is no evidence that Grant failed to follow the court's instructions. Lloyd has not demonstrated that he was prejudiced by his counsel's failure to exercise a peremptory challenge against Grant. *Page 16 
 {¶ 49} As for Ms. Mobley, Mobley indicated during jury selection that she worked nights and that she had a "serious problem" staying awake during the day. She indicated that she gets "punch drunk" about 2:00 or 3:00 p.m. In reply, defense counsel offered to "throw something at [her] every once and a while" to keep her awake. Lloyd asserts that Mobley's overtiredness "was not a disability to be accommodated and cured by battery."
 {¶ 50} Although we agree with Lloyd that an anticipated inability to be awake during the day is a reasonable basis to excuse a juror, there is no evidence in the record that Mobley failed to stay awake and alert during the trial and deliberations. In the absence of such evidence, Lloyd has not demonstrated that he was prejudiced by his counsel's failure to exercise a peremptory challenge against Mobley.
 {¶ 51} "C. Valuation of Property
 {¶ 52} Two of Lloyd's bases for his ineffective assistance of counsel claims are that his attorney mishandled the issue of the value of the property stolen. Lloyd asserts that his counsel did not adequately research or understand the measure by which the property involved in this case should have been valued, and that he failed to properly object to the admissibility of a purchase order and other evidence of the value of National City's property.
 {¶ 53} In convicting Lloyd of receiving stolen property, the jury found Lloyd guilty of "Receiving Stolen Property, as charged in the indictment." Although the court's verdict entry refers to the indictment as "RSP ($500.00 or more)," the jury verdict form did not specify the value of the stolen property or the degree of the offense.
 {¶ 54} The Supreme Court of Ohio has held that, "[p]ursuant to the clear *Page 17 
language of R.C. 2945.75, a verdict form signed by a jury must include either the degree of the offense of which the defendant is convicted or a statement that an aggravating element has been found to justify convicting a defendant of a greater degree of a criminal offense."State v. Pelfrey, 112 Ohio St.3d 422, 2007-Ohio-256, 860 N.E.2d 735. Because the jury verdict form in this case did not include the degree of the offense or the value of the stolen property, Lloyd could only be convicted of the least degree of the offense. We find Lloyd's conviction as a fifth degree felony to be plain error, and the judgment must be modified to a first degree misdemeanor.
 {¶ 55} In response to our request for additional briefing onPelfrey, the state notes that "the lack of a jury finding on the value of the stolen computer equipment renders moot Lloyd's arguments that the State failed to present sufficient evidence of value and that defense counsel was ineffective for failing to object to the State's evidence of value." We agree. Because the state was not required to prove that the value of the stolen property fell within a particular range for a first degree misdemeanor conviction, Lloyd's arguments with regard to value are moot.
 {¶ 56} "D. Restitution
 {¶ 57} Finally, Lloyd argues that his counsel was ineffective by failing to request a hearing on restitution. Lloyd further contends that the trial court ordered restitution in an amount that was not supported by competent, credible evidence. Because Lloyd's conviction must be modified to a first degree misdemeanor, Lloyd's sentence-including the restitution order — must be vacated, and the case must be remanded for resentencing. Accordingly, Lloyd's arguments regarding the trial court's imposition of restitution are moot. Lloyd may request a restitution hearing upon remand. *Page 18 
 {¶ 58} The first, third, fourth, and fifth assignments of error are overruled.
 {¶ 59} "VI. "THE CUMULATIVE EFFECT OF THE ERRORS OCCURRING AT TRIAL DEPRIVED APPELLANT OF A FAIR TRIAL."
 {¶ 60} Under his sixth assignment of error, Lloyd argues that the cumulative effect of the errors at trial denied him a fair trial. The Supreme Court of Ohio has stated that numerous harmless errors may cumulatively deprive a defendant of a fair trial and thus may warrant the reversal of his conviction. State v. DeMarco (1987),31 Ohio St.3d 191, 509 N.E.2d 1256, paragraph two of the syllabus. As discussed above, Lloyd's trial was not without error. However, upon a complete review of the record, we cannot conclude that Lloyd was denied a fair trial.
 {¶ 61} The sixth assignment of error is overruled.
 {¶ 62} The judgment of conviction will be affirmed, as modified to a first degree misdemeanor. The sentence will be vacated, and the case will be remanded for resentencing
BROGAN, J. and GRADY, J., concur.
(Hon. George M. Glasser retired from the Sixth District Court of Appeals sitting by assignment of the Chief Justice of the Supreme Court of Ohio).
Copies mailed to:
R. Lynn Nothstine
Charles Bursey II
 Hon. Barbara P. Gorman *Page 1